IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| In Re: Motion To Intervene And Unseal Search Warrant Records | * |
|  | * |
|  | * |
|  | * |

* Case No. 8:25-mc-00539-TJS

*******

## UNITED STATES' NOTICE OF *EX PARTE* FILING OF PARTIALLY REDACTED SEARCH WARRANT AFFIDAVIT

The United States hereby provides notice that it has filed a proposed redacted version of the search warrant affidavit in this matter *ex parte* to the Court.

Respectfully submitted,

KELLY O. HAYES
UNITED STATES ATTORNEY

By: _____ /s/ _____
Robert I. Goldaris
Thomas M. Sullivan
Assistant United States Attorneys



# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF
THE PREMISES LOCATED AT
█████████████████

Case No. 8:25-mj-02126-TJS

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, ███████████ being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been so employed since ██████ I attended New Agent training at the FBI Academy in Quantico,

Virginia. I am currently assigned to the FBI's Baltimore Field Office where I work a variety of

national security and cyber investigations involving counterintelligence, export control

violations, counter-proliferation, and illicit finance, many of which involve violations of Title 18

of the United States Code. During my tenure, I have conducted physical and electronic

surveillance, executed search warrants, debriefed confidential sources, and reviewed court

records. ███████████████████████████████

████████████████████████████████████

███████████████

2.      The facts in this affidavit come from my observations, training, experience, and

information obtained from other Agents, witnesses, and third-party experts. Because this

affidavit is being submitted for the limited purpose of establishing probable cause for a search

warrant, I have not included every detail of every aspect of the investigation. Rather, I have set

forth only those facts that I believe are necessary to establish probable cause. I have not,

however, excluded any information known to me that would undermine a determination of probable cause.

3.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the residence of John Robert Bolton, II ("Bolton"), located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("TARGET RESIDENCE"), which is described more fully in Attachment A-1. Based on my training, experience, and the facts as set forth in this affidavit, I respectfully submit there is probable cause to believe that John Robert Bolton II committed violations of federal criminal law, including violations of Title 18, United States Code, Section 793(d), Title 18, United States Code, Section 793(e), and Title 18, United States Code 1924(a) (collectively, the "Subject Offenses"), and that evidence, fruits, and instrumentalities of the Subject Offenses, more particularly described in Attachment B, will be found within the **TARGET RESIDENCE**.

## THE RELEVANT STATUTES

4.    Title 18, United States Code, Section 793(d) provides:

> Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it . . . shall be [subject to criminal penalties].

5.    Title 18, United States Code, Section 793(e) provides:

> Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which

2

information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it . . . shall be [subject to criminal penalties].

6.      Title 18, United States Code, Section 1924(a) provides:

Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be [subject to criminal penalties].

## CLASSIFIED AND NATIONAL DEFENSE INFORMATION

7.      Executive Order 13526 governs the classification of national security information. Information in any form may be classified if it: (1) is owned by, is produced by or for, or is under the control of the U.S. Government; (2) could, if disclosed, cause one or more specified levels of harm to the United States; and (3) is classified by or under an Original Classification Authority ("OCA") who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. OCAs, also called original classifiers, are individuals authorized to classify information and make classification decisions.

8.      Pursuant to Executive Order 12958, signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information is classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL," as follows:

a. Information is classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe.

3

    b. Information is classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe.

    c. Information is classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

9.    The classification marking "NOFORN" stands for "Not Releasable to Foreign Nationals" and denotes that dissemination of that information is limited to United States persons.

10.    The classification marking "SI" stands for "Special Intelligence," and denotes intelligence information derived from the monitoring of foreign communications signals by individuals other than the intended recipients.

11.    Classified information related to intelligence sources, methods, and analytical processes is designated as Sensitive Compartmented Information ("SCI"). SCI is to be processed, stored, used, or discussed in an accredited Sensitive Compartmented Information Facility ("SCIF"), and only individuals with the appropriate security clearance and additional SCI permissions are authorized to have access to such national security information.

12.    The National Institute of Standards and Technology defines a SCIF as an area, room, group of rooms, buildings, or installation certified and accredited as meeting Director of National Intelligence security standards for the processing, storage, and/or discussion of sensitive compartmented information.

13.    Intelligence Community Directive 705, titled "Sensitive Compartmented Information Facilities," signed on May 26, 2010, by the Director of National Intelligence, provides that "all SCI must be processed, stored, used, or discussed in an accredited SCIF."

14.    Pursuant to Executive Order 13526, information classified at any level can be lawfully accessed only by persons determined by an appropriate U.S. Government official to be

eligible for access to classified information, and who signed an approved non-disclosure agreement, received a security clearance, and have a need to know the classified information.

15.    Executive Order 13526 also states that classified information contained on automated information systems, including networks and telecommunications systems that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that (1) prevents access by unauthorized persons and (2) ensures the integrity of the information.

16.    The term "national defense information" (herein "NDI") has been defined broadly by the Fourth Circuit Court of Appeals in *United States v. Morison*, 844 F.2d 1057, 1071 (4th Cir. 1988), to include "all matters that directly or may reasonably be connected with the national defense of the United States against any of its enemies. It refers to the military and naval establishments and the related activities of national preparedness." *Morison* and subsequent appellate decisions have consistently construed the term to include information dealing with military matters and more generally with matters relating to United States foreign policy and intelligence capabilities. Thus, based upon my experience, training, and discussions with other subject-matter experts, I submit that there is probable cause to believe that the information removed and retained without authorization by John Robert Bolton, II, as described below, constitutes NDI for purposes of Sections 793(d) and 793(e) of Title 18 of the United States Code.

### JURISDICTION

17.    This Court has jurisdiction to issue the proposed warrant because the property to be searched and seized is located within the district where the warrant will be issued pursuant to Rule 41(b)(1). Specifically, the **TARGET RESIDENCE** is located within the District of Maryland.

5

## PROBABLE CAUSE

18.     John Robert Bolton, II, is a 76-year-old United States citizen who resides in

Bethesda, Maryland. Bolton is a former public servant, with nearly four decades of service in

positions of trust within the U.S. government. Bolton is an attorney, who previously served as,

among other things, General Counsel and Assistant Administrator for the U.S. Agency for

International Development; Assistant Attorney General at the Department of Justice; Assistant

Secretary and Under Secretary at the Department of State; U.S. Ambassador to the United

Nations; and Assistant to the President for National Security Affairs ("APNSA"), commonly

referred to as the National Security Advisor.

19.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████

*Bolton's Tenure as APNSA,* ████████*, and Separation from Government Service*

20.     Bolton's most recent position within the U.S. government was APNSA. He held

that position from April 9, 2018, to September 10, 2019. For his duration as APNSA, Bolton

held a TOP SECRET/SCI security clearance.

21.     As APNSA, Bolton directed and supervised the work of the National Security

Council ("NSC") staff on behalf of the President of the United States. Bolton had access to, and

was responsible for, safeguarding the most sensitive national-security information, including

both classified and National Defense Information.

22.     While in consideration for his appointment as APNSA, Bolton executed a

Classified Information Nondisclosure Agreement ("NDA"), titled Standard Form 312 ("SF-

---

1 ████████████████████████████████████████

312"), and two Sensitive Compartmented Information ("SCI") NDAs, titled Standard Form 4414

("SF-4414") on April 5, 2018. By signing the SF-312, Bolton acknowledged that "the

unauthorized disclosure . . . of classified information by me could cause damage or irreparable

injury to the United States" and agreed "never [to] divulge classified information" without "prior

written notice of authorization from" the relevant government agency.  By signing the two SF-

4414s, Bolton also promised "never [to] divulge anything marked as SCI or that I know to be

SCI to anyone who is not authorized to receive it without prior written authorization."  In both

agreements, Bolton acknowledged that the disclosure of classified information "may constitute a

violation, or violations, of United States criminal laws."



23.

24.

.25.      A letter was sent to Bolton by the White House Counsel and Legal Advisor to the

NSC on September 10, 2019, upon Bolton's separation from service with the U.S. government.

The letter reminded Bolton of his continuing responsibility and obligation to "protect all

7

confidential, privileged, and classified information and to provide for the safe return of all

government property that you received in connection with your position at the Executive Office

of the President ("EOP")." The letter further stated,

> As the Assistant to the President for National Security Affairs, you were entrusted
> with information protected from disclosure, including classified information that
> related to some of the most sensitive matters of national security. You were
> previously advised that unauthorized disclosure, unauthorized retention, or
> negligent handling of certain classified information could cause irreparable injury
> to the United States or be used to advantage by a foreign nation. . . . All of these
> obligations extend beyond your period of employment at the EOP and the period
> in which you have access to classified information.

A copy of the letter was sent as an attachment to Bolton's personal AOL email address (the

"Bolton AOL Account").



8



29.

*2020 Book Pre-Publication Review*

30.      According to government records, Bolton submitted a draft manuscript for his book "The Room Where It Happened: A White House Memoir" to the NSC for the required pre-publication review process on or about December 30, 2019. A letter sent from Ellen J. Knight ("Knight"), the NSC Senior Director for Records, Access and Information Security Management to Bolton's attorney on January 23, 2020, acknowledged receipt of Bolton's manuscript, and notified Bolton that, based on a preliminary review, the manuscript appeared to contain

significant amounts of classified information, to include information classified at the TOP

SECRET level.[2]

31.    Another letter was sent via email from Knight to Bolton's attorney on February 7,

2023. The letter suggested that Bolton modify and resubmit the manuscript due to the large

volume of classified information contained in the manuscript. The letter further stated,

> As written, the manuscript is very detailed, suggesting that it was likely produced
> from notes written by your client during his service at the White House. When
> your client received his employee debriefing, he stated that he did not have any
> notes or other records from his government service. Any notes that remain in your
> client's possession regarding the accounts in the manuscript may fall under the
> requirements of the Presidential Records Act and be subject to litigation holds.
> Please confirm whether your client has retained any notes or other records from
> his government service.



32.

33.

---

[2] In ruling on the government's request for a temporary restraining order and preliminary
injunction to stop the release of the book, Judge Royce C. Lamberth stated in the court's order
that "Bolton has gambled with the national security of the United States. He has exposed his
country to harm and himself to civil (and potentially criminal) liability." *United States v. Bolton*,
468 F. Supp. 3d 1, 7 (D.D.C. June 20, 2020).



34.

35.    A letter sent via email from Knight to Bolton's attorney on February 24, 2020, references and described a meeting held in person on the previous Friday between Knight and Bolton to review the manuscript. According to the letter, Knight reviewed instances of classified information in the manuscript and Bolton "appeared to acknowledge" the need to modify the

11

manuscript to remove classified information. Attached to the email was a photocopy of notes taken by Bolton during the meeting, which had been redacted to remove classified information.

*Hack of Bolton AOL Account by Foreign Entity*

36.



37.

38.



39.

40.

41.

13

42. 

43.

44.

45.

46.

47. 

48.

49.

50.

51.

52.



53.

54.

55.

56. ███████████████████████████████
████████████████████████████████████
█████████████████████████
███████████████████████████████

57. ███████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████

58. ███████████████████████████████
██████ ████████████████████████████
████████████████████████████████

59. ███████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████





60.

61.

62.

63.

64.

18



65.

66.

67.



68.

69.

70.

71.



72.

73.

74.

75.    Based on my training, experience, and education, including my familiarity with the facts and circumstances of this investigation, and discussions with other FBI personnel, I respectfully submit that there is probable cause to believe that evidence of the unlawful retention

and transmission of classified information and National Defense Information—including copies

of documents containing such information—are located in the **TARGET RESIDENCE.**

### EVIDENCE OF BOLTON'S KNOWLEDGE OF RULES GOVERNING THE HANDLING OF CLASSIFIED INFORMATION

76.    Throughout Bolton's government career, including as a Department of Justice

official and as National Security Advisor to the President, he has been given access to classified

information and national defense information. Bolton has made numerous public statements

about (1) the sensitivity of classified information; (2) the myriad adverse impacts on national

security if classified information is mishandled; (3) his personal experience and practice in

handling classified information (including through the use of secure communications facilities

and SCIFs); and (4) his frequent criticism of how other government officials have handled

classified information, including his opinions about whether the mishandling of classified or

national defense information by one or more individuals constitutes a federal crime.

77.    During a September 2, 2016, interview with Fox Business Network,[3] for example,

Bolton discussed the then-recent revelation about a former Secretary of State's use of a private

email server for government business, including the credibility (or lack of credibility) of the

former Secretary of State's story about how it happened: "I remember those sorts of things

because if you're conscious of the need to protect classified information you'll remember what

the rules are[.]"

78.    During a January 16, 2017, interview on Fox Business Network, Bolton continued

to address the seriousness of the allegation involving Russian hacking of Democratic National

Committee computer servers, and the consequences of mishandling classified information,

---

[3] John Bolton: Clinton displayed gross negligence with her emails. Fox Business
https://youtu.be/20sSuoFHcGI?si=Qs-bFGLAaGXmw8QA.

stating, "Look, as I've said before, I believe it's still to this day, if I had done at the State Department what Hillary Clinton did, I'd be wearing an orange jumpsuit now." When asked about his opinion why government officials did not move their conversation to a secure government communications network, Bolton replied, "[H]ere's communication of sensitive information for dummies, the way I would look at it. You're either on a secure governmental system or you're not. You're not on a secure governmental system, you got a problem[.]"[4]

79.    During an April 18, 2025, podcast interview, Bolton offered his views on allegations that U.S. government officials had communicated sensitive government information using Signal, an encrypted messaging platform:

> Initially, I was totally without words. I couldn't-I couldn't find-I couldn't find a way to express how stunned I was that anybody would do this. You simply don't use commercial means of communication, whether it's supposedly an encrypted app or not for for these kinds of discussions. You know, you don't know where they're gonna go. You could start off talking about a newspaper article, but but obviously you could get into classified material. I understand why you need to have group chats, but as I've been saying the place for the group chats are the Situation Room where everybody's in place some people may have to appear via secure video teleconference facilities, and and we've got great capacity to do that. But, but having chat groups where you're writing two or three sentences that this is not what you would call sophisticated national security analysis at work, and on an unsecured channel. It just, there's there's no excuse for it.[5]

80.    When asked to comment about an administration official's characterization of the Signal situation as overblown, Bolton disagreed, stating, "I don't think that's a valid point. The question is what was the potential damage to the United States this kind of behavior caused[.]" Bolton went on to discuss how the unauthorized disclosure of classified information can cause damage to U.S. national security, and how that information is useful to foreign adversaries:

---

[4] *Id.* at 3:43.
[5] LEMON DROP – Bolton on Signal-Gate, Trump, and the Constitutional Crisis, available at https://youtu.be/7QLsu2fMpRc (Apr. 18, 2025). Starting at 10:25.

[W]hat were they doing off of secure government channels, that is the original sin here. That is the question neither one of them has yet answered. You just referred to potential damage: has actual damage been done, though I think actual damage is possible because of the way foreign intelligence services operate, the way our own intelligence services operate. You take everything you can get. You take every piece of information in this case about American military operations against the Houthis in Yemen it tells you something that otherwise you wouldn't know about American capabilities, American tactics, American approaches to this kind of thing and that is useful to the Russians, the Chinese, the Iranians, the North Koreans, and others as well. How that fits into the body of knowledge they already have is a question I can't answer, but it can't help, that's for sure.[6]

81.     During an April 25, 2025 interview on CNN, Bolton discussed that a person's

ability to access classified information was a function not just of a person's security clearance

level, but that the person receiving the classified information had a need to know the information:

I think the second example of a Signal chat group . . . really shows a terrible lack of judgment and communicating with the people in this group in particular who have absolutely no need to know about any upcoming U.S. military operation leads me to wonder what he's doing on the job on a minute to minute hour by hour basis that he's got time to to knock out signal messages to to friends and family.[7]

82.     Bolton addressed his concerns that the potential mishandling of classified

information by high-level government officials might have adverse downstream consequences:

This is not just for the people who are directly involved in that Signal group chat. It's for the thousands of other people in the federal government who handle sensitive information and are held to a higher standard, and they need to know that those standards apply up and down the line[.][8]

### THE TARGET RESIDENCE

83.     Based on my training and experience, I know that individuals who engage in

offenses like the Subject Offenses are likely to have documents and media within their

---

[6] John Bolton Reacts to War Group Chat Leak - Channel 4 News, Mar. 26, 2025, found at https://youtu.be/I3n1577TBk4.
[7] Trump's NSA RIPS INTO His SLOPPY Defense Secretary on A Fresh Signal SCANDAL https://youtu.be/z_OJ0uphV1E?si=_pNesP122dyYYXYQ (Apr. 25, 2025) (emphasis added).
[8] *Id.* at 15:47.

residences and offices that constitute evidence, fruits, and instrumentalities of those crimes. Furthermore, I know that it is common for those involved in the Subject Offenses to keep and conceal this information and these records, documents, and things in both hard-copy and digital form within computers, laptops, tablets, iPads, flash drives, cellular telephones, and other electronic storage devices.

84.    According to a Real Property Data Search of the Maryland Department of Assessments and Taxation, the owner of the **TARGET RESIDENCE** is "John R Bolton" and

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

85.    As described above and in Attachment B, these applications seek permission to search for electronic devices, documents and other records that might be found in the **TARGET RESIDENCE**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other electronic storage media. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

86.    *Probable cause.* I submit that if a computer or storage medium is found in the **TARGET RESIDENCE**, there is probable cause to believe that records involving the Subject Offenses will be stored on that computer or storage medium, for at least the following reasons:

> a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

> b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

25

used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

87. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET RESIDENCE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information

26

stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

27

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

88.    *Necessity of seizing or copying entire computers or storage media.* In most cases,

a thorough search of a location (including a person) for information that might be stored on

storage media often requires the seizure of the physical storage media and later off-site review

consistent with the warrant. In lieu of removing storage media from a premises such as the

**TARGET RESIDENCE,** or from an individual pursuant to a search warrant, it is sometimes

possible to make an image copy of storage media. Generally speaking, imaging is the taking of a

complete electronic picture of the computer's data, including all hidden sectors and deleted files.

Either seizure or imaging is often necessary to ensure the accuracy and completeness of data

recorded on the storage media, and to prevent the loss of the data either from accidental or

intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time in the TARGET RESIDENCE could be unreasonable. As explained above, because the warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the TARGET RESIDENCE. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

28

      c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

89. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## UNLOCKING BIOMETRICALLY SECURED DEVICES

90. The warrant for the **TARGET RESIDENCE** also would permit law enforcement to obtain from Bolton the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to the above-referenced warrants. I seek this authority based on the following:

91. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of an alphanumeric password or pattern password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer only one of these features, while others offer a combination of these features, and the user of such a device can select the features that the user would like to utilize.

92. Additionally, I know that some encrypted messaging applications, such as certain versions of Signal and WhatsApp, offer users the ability to unlock the application using biometric authentication tools.

93.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, some Apple devices offer a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

94.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similar to Face ID.

95.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

96.     As discussed in this affidavit, I believe that one or more digital devices will be

found during the search. The passcode(s) or password(s) that would unlock the devices (or applications) subject to search are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

97.    I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled. These circumstances might, or might not, include: (1) when more than 48 hours has passed since the last time the device was unlocked, (2) when the device has not been unlocked for 8 hours and the passcode or password has not been entered in the last 6 days, (3) when the device has just been restarted or powered on, (4) when attempts to unlock via fingerprint have failed a specified number of times, (5) when the device has received a remote lock command. Thus, in the event that law enforcement encounters a locked device, the opportunity to unlock the device via fingerprint may exist only for a short time.

98.    In my training and experience, the person who is in possession of a device, or who has the device among his or her belongings at the time the device is found, is likely a user of the device. However, I know that in some cases, it may not be possible to know with certainty who is the user of a given device, including if the device is found in a common area of a premises without any identifying information on the exterior of the device.

99.    Accordingly, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, the requested warrants would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of Bolton to the fingerprint

31

scanner of the device(s); and/or (2) hold the devices in front Bolton's face for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by the warrants.

## CONCLUSION

100.    Based on the above facts, I submit that there is probable cause to believe that Bolton has committed the Subject Offenses and there is probable cause to believe that the **TARGET RESIDENCE**, as further described in Attachment A, will contain evidence, fruits, and instrumentalities of the Subject Offenses, as described in Attachment B.

101.    Thus, I respectfully request that the Court issue a search warrant authorizing the search of information described in Attachment A, to seek the items described in Attachment B.

## REQUEST FOR SEALING

102.    I further request that the Court order all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the target(s) of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give Bolton or others who may be involved in this criminal activity an opportunity to flee, destroy or tamper with evidence (including electronic accounts that can be deleted before law enforcement is aware of their existence), change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____21st_____ day of August, 2025.

HONORABLE TIMOTHY J. SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE

33

## ATTACHMENT A
**Property to Be Searched**

The **TARGET RESIDENCE** is a residence located at 
The **TARGET RESIDENCE** is a



34

## ATTACHMENT B

### Particular Things to be Seized

All items, records, documents, files, or materials, in whatever form they exist, that constitute evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 793(d), Title 18, United States Code, Section 793(e), and Title 18, United States Code 1924(a), (the "Subject Offenses") involving John Robert Bolton II (Bolton) ███████████ occurring on or after April 9, 2018, including:

1. All physical documents and records with or without classification markings that appear to be classified, relate to Bolton's former position as Assistant to the President for National Security Affairs, ████████ along with any containers or boxes (including any other contents) in which such documents are located, as well as any other containers or boxes that are collectively stored or found together with the aforementioned documents and containers or boxes;

2. Information, including communications in any form, regarding the retrieval, storage, or transmission of classified material or information related to the national defense;

3. Any digital devices[9] electronic storage media[10] and/or their components, that may constitute instrumentalities of, or contain evidence of the Subject Offenses, including:

    a. any digital device or other electronic storage media used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, encryption devices, or optical scanners;

    b. any magnetic, electronic, or optical storage device capable of storing data, such as USB devices, SD cards, CDs, DVDs, optical disks, smart cards, PC cards, electronic notebooks, and personal digital assistants;

    c. any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

---

[9] Digital devices" include any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units; laptop, desktop, notebook, or tablet computers; computer servers; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, routers and switches; electronic/digital security devices; wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, and Blackberries; digital cameras; digital gaming devices; global positioning satellite devices (GPS); or portable media players.

[10] "Electronic storage media" is any physical object upon which electronically stored information can be recorded, including hard drives, flash memory, USB devices, SD cards, CD, DVDs, and other magnetic or optical media.

    d.  any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

    e.  any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

    f.  any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

4.  For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

    a.  evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chats," instant messaging logs, photographs, and correspondence;

    b.  evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

    c.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

    d.  evidence of the times the digital device or other electronic storage media was used;

    e.  evidence of access to electronic accounts of people other than Bolton, including Google, Apple, Microsoft 365, and social media platforms.

    f.  passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

    g.  documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media; and

    h.  contextual information necessary to understand the evidence described in this attachment.

5.    Information[11] that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the Subject Offenses or (ii) communicated about matters relating to the Subject Offenses, including records that help reveal their whereabouts;

6.    Information that constitutes evidence indicating state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the Subject Offenses;

7.    Information as to the identities, roles and responsibilities of coconspirators, accomplices, and aiders and abettors in the commission of the Subject Offense, including but not limited to records that would reveal their whereabouts;

8.    Communications of any kind with other individuals regarding the Subject Offense;

9.    Passports, visas and travel records (solely as to Bolton);

10.    All appointment books, schedules, calendars, list of contacts, telephone message slips, phone records, diaries, memos, and all other similar items (solely as to Bolton).

11.    All records, documents, programs, applications, and materials that show indicia of occupancy, residency, control and/or ownership of the **TARGET RESIDENCE**, including but not limited to utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes, keys, photographs and bank records.

12.    All safes, whether combination or lock type, and their contents, and all storage facility and safety deposit box records and keys

13.    Records and things evidencing the use of an Internet Protocol ("IP") address to communicate with the internet including:

    a.    records of IP addresses used; and

    b.    records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorited" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

---

[11] As used herein, the terms "records," "documents," and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); any photographic form; or any physical form.

14.  This warrant authorizes the search and forensic analysis of electronic devices containing the foregoing evidence if:

    a.  The electronic devices are found within rooms known or discovered to be used by Bolton, ███████████████████

    b.  A person inside the premises advises officers executing the warrant that the electronic devices were used by Bolton, ███████████████████

    c.  Officers reasonably believe the device was utilized in connection with the use of an electronic device falling into one of the two categories listed above.

15.  This warrant does not authorize the search or forensic analysis of electronic devices that do not fall within the scope of the preceding paragraph.

With respect to the search of any electronic device falling within the scope of this warrant believed to be owned, possessed, or used by Bolton, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Bolton to the fingerprint scanner of a device; (2) hold the device in front of the face of Bolton and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3.  "scanning" storage areas to discover and possible recover recently deleted files;

4.  "scanning" storage areas for deliberately hidden files; or

5.  performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

38

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.